580 F.2d 91
 Dorothy L. DRAPER, Individually and as General
Administratrix and Administratrix ad Prosequendum
of the Estate of Robert W. Draper, Deceased,
v.
AIRCO, INC. and United States Steel Corporation, Defendants.
AIRCO, INC., Defendant and Third-Party Plaintiff-Appellant
in No. 77-1836,
v.
W. V. PANGBORNE & CO., INC., Third-Party Defendant-Appellant
in No. 77-1837.
Appeal of UNITED STATES STEEL CORPORATION in No. 77-1905.
 Nos. 77-1836, 77-1837 and 77-1905.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 24, 1978.
Decided June 28, 1978.
 
 L. Carter Anderson, Carl D. Buchholz, III, Rawle & Henderson, Philadelphia, Pa., for appellant, U. S. Steel Corp.
 John R. Gercke, Schuenemann, Gercke & Picknally, Haddonfield, N. J., for appellant, W. V. Pangborne & Co., Inc.
 Norman G. Slade, Porzio & Bromberg, P. C., Morristown, N. J., for appellant, Airco, Inc.
 Before ADAMS, HIGGINBOTHAM, Circuit Judges, and BECHTLE, District Judge.*
 OPINION
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 On September 23, 1970, Robert Draper, an electrician, died apparently from electrocution while installing a switch on an energized line on the premises of the United States Steel Corporation. The decedent's wife instituted this wrongful death and survival action against U.S. Steel, Airco, Inc. and W. V. Pangborne & Co., in the United States District Court for the District of New Jersey. Jurisdiction is based on diversity of citizenship.[1] Because of the patently improper remarks by plaintiff's counsel in his closing argument to the jury, the jury verdict for $585,789.55 must be overturned, and a new trial granted on both liability and damages.
 
 
 2
 Briefly stated, the facts of the case are as follows. The United States Steel Corporation had contracted with general contractor Airco, Inc. to construct an oxygen producing plant at U.S. Steel's facilities in Fairless Hills, Pennsylvania. An initial step in this project was the construction of a temporary oxygen storage facility. To provide power for this temporary facility, an overhead electrical feeder line was run to the facility from U.S. Steel's hot strip mill which was approximately fifty to sixty feet away. Airco sub-contracted this electrical work to W. V. Pangborne & Co., Inc. which hired Draper. The line was connected without incident on August 22, 1970. U.S. Steel requested that an "off-on" switch be installed on this feeder line so that Airco and Pangborne employees would not have to enter U.S. Steel's mill in order to turn the power off and on. It was decided that the switch would be installed while the line was energized or "hot." The parties have different versions of exactly how that decision was reached and who was responsible for it. The switch was to be placed on the outside wall of the hot strip mill. At the time of his death, Draper was on a ladder working on wiring inside the mill.
 
 
 3
 After this action against U.S. Steel, Airco and Pangborne was filed, Pangborne moved for summary judgment. The motion was granted on the ground that Pangborne was immune from suit under New Jersey's Worker's Compensation Act. U.S. Steel and Airco filed motions to join Pangborne on the basis of claims for contribution and common law indemnity. These motions were denied, but Airco's motion to join Pangborne as a third-party defendant on the basis of a contractual indemnity provision was granted. Following a hearing without the jury, this indemnity provision was held to be enforceable. U.S. Steel subsequently filed a third-party complaint against Pangborne again seeking contribution. This complaint was dismissed after trial. U.S. Steel also filed a cross-complaint against Airco based on a contractual indemnity provision. The district court held that U.S. Steel was not entitled to indemnity from Airco.
 
 
 4
 During the course of the trial, the proceedings were bifurcated. In the liability phase, a jury verdict was returned in favor of the plaintiff. All three defendants were found to have been negligent. In the damages phase, the jury returned a verdict of $430,000 which was increased to $585,789.55 to account for prejudgment interest.
 
 
 5
 All three defendants appeal from the judgment in favor of Draper. Pangborne also appeals from the order directing it to indemnify Airco. U.S. Steel also appeals from the denial of its claim for contribution against Pangborne and its claim for indemnity against Airco. Airco also appeals from the denial of its claim for common law indemnity against Pangborne.
 
 
 6
 In addition to finding that it was reversible error to refuse to grant a new trial because of improper remarks by plaintiff's counsel in his closing argument to the jury, we will also address other issues raised on this appeal so that the distinguished trial judge may have our rulings on some of the intricate legal issues that he will confront in a new trial.
 
 A. PLAINTIFF'S CLOSING ARGUMENT
 
 7
 As indicated, the central issue on this appeal is whether the district court erred in refusing to grant a new trial because of prejudicial remarks made by plaintiff's counsel in his closing argument to the jury in the liability phase of the trial. We are forced to conclude that the district court did err and that a new trial must be granted. We recognize that the trial judge has considerable discretion in determining whether conduct by counsel is so prejudicial as to require a new trial. Lewis v. Penn Central,459 F.2d 468 (3d Cir. 1972); Corbett v. Borandi, 375 F.2d 265 (3d Cir. 1967). The remarks of counsel here, however, so far exceed the bounds of proper argument that we are bound to reverse the district court.[2]
 
 
 8
 In reaching this conclusion, we wish to emphasize that we do not expect advocacy to be devoid of passion. A life has been lost here and the family is entitled to have someone speak with eloquence and compassion for their cause. But jurors must ultimately base their judgment on the evidence presented and the rational inferences therefrom. Thus, there must be limits to pleas of pure passion and there must be restraints against blatant appeals to bias and prejudice. These bounds of conduct are defined by the Code of Professional Responsibility and the case law.
 
 
 9
 Counsel for the plaintiff breached a number of the rules of proper argument. Specifically, he committed the following improprieties: (1) he attempted to prejudice the jurors through repeated inappropriate references to the defendants' wealth; (2) he asserted his personal opinion of the justness of his client's cause; (3) he prejudicially referred to facts not in evidence; and (4) without provocation or basis in fact, he made several prejudicial, vituperative and insulting references to opposing counsel.
 
 
 10
 Counsel repeatedly made reference to the wealth of the defendants in contrast to the relative poverty of the plaintiff. Appealing to the sympathy of jurors through references to financial disparity is improper. See Edwards v. Sears, Roebuck & Co., 512 F.2d 276 (5th Cir. 1975); Foster v. Crawford Shipping Co., Ltd., 496 F.2d 788 (3d Cir. 1974); Koufakis v. Carvel, 425 F.2d 892 (2d Cir. 1970). See also U. S. v. Socony Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (appeals to class prejudice improper).
 
 
 11
 Although the amount of money at stake in the construction project on which the decedent worked is relevant in that it establishes a motive for the defendants to ignore reasonable safety precautions, when the argument is read as a whole, it is clear that counsel's remarks were intended to arouse the prejudices of the jury rather than to make this evidentiary contention. Counsel referred to the seven million or seven point four million dollar contract between Airco and U.S. Steel ten times.[3] He referred to U.S. Steel's owning four thousand acres of land. Counsel gratuitously referred to his asking an officer of defendant Pangborne whether it or its parent company was the biggest electrical contractor in the world. Counsel, somewhat incoherently, stated: "I am going to make the equalizer. You know what the equalizer between the multimillion dollar there for Dorothy Draper and her kids, it's right here. On that side of the room are bills of dollars and on this side of the room is the equalizer." He continued "(I)n this case I brought you the giants, the giants of the industrial world . . . " And then, "I am going to ask you to tumble the magnificent big companies here with all their engineers."
 
 
 12
 Of course, this argument, as excerpted above, would not require reversal if counsel had not gone beyond the brink of rational argument in other aspects. The cumulative thrust of plaintiff's counsel's argument, however, was that because the defendants were rich (giants of the industrial world) and because the plaintiff was poor, the jury should base its verdict in favor of plaintiff on this financial disparity. But justice is not dependent upon the wealth or poverty of the parties and a jury should not be urged to predicate its verdict on a prejudice against bigness or wealth.
 
 
 13
 The second impropriety is counsel's assertion of his personal opinion of the justness of his client's cause in violation of Disciplinary Rule 7-106(C)(4).[4] Counsel also spoke of his meeting and talking to the Draper children none of whom had testified.[5] Reference to facts not in evidence is improper. See Ayoub v. Spencer, 550 F.2d 164 (3d Cir. 1977). Edwards v. Sears Roebuck and Co., supra at 284-85. This impropriety is compounded where, as here, the reference is to the dependent children of the plaintiff. See Edwards v. Sears Roebuck and Co., supra at 285 (reference to deceased's children crying at graveside); Tropea v. Shell Oil Co., 307 F.2d 757, 769 (2d Cir. 1962) (reference to children improper, but not basis for reversal because innocent in purpose and effect).[6]
 
 
 14
 The final category of improper conduct committed by counsel is the repeated vituperative and insulting references to the defendants and defendants' counsel. See Koufakis v. Carvel, 425 F.2d 892, 903 (2d Cir. 1970); San Antonio v. Timko, 368 F.2d 983 (2d Cir. 1966); Disciplinary Rule 7-106(C)(6).[7]
 
 
 15
 Counsel, in referring to Airco's head engineer on the project, stated, "He was in an evil league, he wasn't used to being with This gang from Pangborne and U.S. Steel Corporation. In comparing the deceased's family wealth with the defendant's economic wealth, counsel stated, "He (the decedent) had more money than Mr. Anderson (attorney for U.S. Steel) and His whole gang. . . . He had more wealth than Mr. Sade (attorney for Airco) and His gang. . . . " As counsel neared his close he went to defendant's counsel table and, pointing to counsel as he spoke,[8] said:
 
 
 16
 I charge Mr. Sade (attorney for Airco) who had the mental poor guy with no brain in there. I charge him, head of a $7,400,000 contract. I charge him as part of the same conspiracy. And I charge Mr. Picknally, (attorney for Pangborne) who didn't have the decency to put a rubber blanket around it or platform (sic) or anything else."
 
 
 17
 In addition, plaintiff's counsel implied that the defendants and their attorneys had deliberately withheld requested documents: "Every time we get to a crucial spot, things disappear."
 
 
 18
 Counsel for the plaintiff while conceding that his conduct in closing was not conduct "which can or should be condoned," argues that the improper statements did not so pervade the trial as to render the verdict a product of prejudice. Counsel also points out that a curative instruction was given.[9] Where, however, a closing address to the jury contains such numerous and serious violations of so many rules of proper argument as occurred here, we must conclude that it is more than "reasonably probable" that the verdict was influenced by the prejudicial statements. See Ayoub v. Spencer,supra. These same factors lead us to the conclusion that the curative instruction was not sufficient to remove the probability of prejudice especially since the instruction was given the day after the closing argument.
 
 
 19
 In reaching this decision, we do not rely on any of the individual instances or types of impropriety. Rather, we have assessed the argument as a whole. Although we are always reluctant to grant a mistrial because of counsel's prejudicial statements when the district court has declined to do so, we nevertheless conclude that the closing argument here, when considered in its entirety, was so constantly and effectively addressed to the prejudices of the jury that we must order a new trial.
 
 
 20
 A jury which is prejudiced with respect to its finding of liability is not likely to be free from prejudice in awarding damages. Because there is a substantial probability that the error which affected the liability verdict also affected the determination of damages, the new trial must deal with both liability and damages. See Vizzini v. Ford Motor Company, 569 F.2d 754, 759-62 (3d Cir. 1977); Romer v. Baldwin, 317 F.2d 919, 922-23 (3d Cir. 1963).
 
 B. REMAINING ISSUES
 
 21
 Since the legal issues raised on this appeal are likely to be raised again in a subsequent appeal, we will address them in the hope of simplifying the future
 
 
 22
 course of this litigation. 1. Whether New Jersey or
 
 
 23
 Pennsylvania Damages and Prejudgment Interest Law
 
 
 24
 Should Be Applied.
 
 
 25
 In diversity cases, the choice of law rules of the district court's forum state are controlling. Klaxon Co. v. Stenton Electric Manufacturing Co., 313 U.S. 487, 494, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). No party contests the district court holding that New Jersey would apply Pennsylvania substantive law in this case. U.S. Steel, however, challenges the district court ruling that New Jersey damages law should be applied with the result that inflation was considered in assessing damages and that the damages award was increased by the application of New Jersey's prejudgment interest rule. New Jersey Supreme Court Rule 4:42-11(b). Pennsylvania does not allow prejudgment interest in tort actions where, as here, the damages sought are unliquidated. Marrazzo v. Scranton Nehi Bottling Co., 438 Pa. 72, 263 A.2d 336 (1970). Pennsylvania also does not allow the jury to consider inflation in computing damages. Kubrick v. U. S., 435 F.Supp. 166, 179 n. 17 (E.D.Pa. 1977); Havens v. Tonner, 243 Pa.Super. 371, 365 A.2d 1271 (1976).
 
 
 26
 The clearest indication of New Jersey's rule on the choice of law with respect to damages is in Busik v. Levine, 63 N.J. 351, 307 A.2d 571 (1973), appeal dismissed, 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973). The issues there were whether the Supreme Court rule authorizing prejudgment interest in tort actions was valid and, if so, whether that rule should be applied retroactively.
 
 
 27
 Since it was argued that the Supreme Court could only validly promulgate rules that deal with procedure, the court looked to whether interest was a matter of procedure or of substance. The court found that "in the context of conflict of laws, the majority view is that 'damages' go to the substance . . . ." Busik, supra 307 A.2d at 580. 22 Am.Jur.2d, Damages, § 3, pp. 15-16 and The Restatement (2d) of Conflict of Laws (1971), §§ 145 & 171 were cited in support of this view. In a footnote, it is mentioned that the result may be different "when the foreign event concerns only citizens of the forum or citizens of States other than the State of injury." Busik, supra at 580, n. 7. This exception, however, does not apply here.
 
 
 28
 The court goes on to state that the majority view is that the state whose law governs the substantive legal questions also governs the prejudgment interest issue. Restatement (2d) of Conflict of Laws (1971) § 171, comment c, specifically supports this result as do a number of cases from outside New Jersey. No New Jersey cases were cited.
 
 
 29
 Thus, the Supreme Court of New Jersey determined that, by the majority view, damages generally and prejudgment interest specifically are a matter of substance insofar as conflict of laws principles are concerned.[10] The court gave no indication that New Jersey's law was otherwise and, indeed, implied that New Jersey would follow this rule. We have found no subsequent cases that indicate a change of view.
 
 
 30
 The parties focused much attention in their briefs on Colley v. Harvey Cedars Marina, 422 F.Supp. 953 (D.N.J.1976). In that case, New Jersey and Pennsylvania law on the computation of damages in a survival action were in conflict, and the district court found that New Jersey would apply New Jersey's law. The court reached that conclusion after analyzing the approaches of Professors Currie and Cavers and finding that on the facts of that case, both would apply New Jersey law.
 
 
 31
 Under Professor Currie's analysis, where the forum and foreign state both have an interest, the forum state's law should apply. Under Professor Cavers' analysis, however, the law of the state of conduct and injury is applied if that state's law sets a lower standard of conduct or of financial protection. In Colley, New Jersey, whose law provides more limited damages, had an interest in protecting its residents (the defendants) from large recoveries. Pennsylvania had an interest in granting higher damages since the plaintiffs were administering a Pennsylvania estate. Thus, under Professor Currie's analysis, since both states have an interest, New Jersey, as the forum state, would apply its own law. Under Professor Cavers' analysis, New Jersey law would be applied on Colley's facts because the wrong occurred in New Jersey and New Jersey provides less financial protection to the tort victim.
 
 
 32
 Under the facts of this case, the view espoused by Professor Currie would lead to the application of New Jersey law since New Jersey is the forum and both states have an interest. The analysis championed by Professor Cavers, however, would lead to the application of Pennsylvania law since Pennsylvania is the state of conduct and injury and Pennsylvania law gives less financial protection to tort victims with respect to the consideration of inflation and the granting of prejudgment interest. Thus, Colley provides little guidance on these facts.
 
 
 33
 Since Colley is not decisive on this issue and since Busik is a relatively clear indication of New Jersey law directly from the New Jersey Supreme Court, we believe that New Jersey would apply the damages law of the state whose substantive law is applied. In this case, therefore, Pennsylvania's damages law should be applied. Thus, the jury should not consider inflation in determining damages and prejudgment interest should not be added to the damages award should liability be found.
 
 
 34
 2. Statute of Limitations.
 
 
 35
 The district court applied New Jersey's wrongful death statute of limitations. We agree with that determination. Although New Jersey no longer mechanically applies its own statutes of limitations, we believe it would do so here. The seminal case on this question is Heavner v. UniRoyal, Inc., 63 N.J. 130, 305 A.2d 412 (1973) where the New Jersey Supreme Court stated:
 
 
 36
 We are convinced the time has come, for the reasons previously outlined, to discard the mechanical rule that the limitations law of this state must be employed in every suit on a foreign cause of action. We need go no further now than to say that when the cause of action arises in another state, the parties are all present in and amenable to the jurisdiction of that state, New Jersey has no substantial interest in the matter, and its limitation period has expired at the time suit is commenced here, New Jersey will hold the suit barred. In essence, we will "borrow" the limitations law of the foreign state. We presently restrict our conclusion to the factual pattern identical with or akin to that in the case before us, for there may well be situations involving significant interests of this state where it would be inequitable or unjust to apply the concept we here espouse.
 
 
 37
 Heavner, supra, 305 A.2d at 418.
 
 
 38
 Applying the foregoing criteria to these facts, it appears that Pennsylvania's statute of limitations would be applied unless we decide that New Jersey's interest in the matter is sufficiently substantial to warrant the application of its limitations statute. Since we find that New Jersey's interest is so substantial, we conclude that New Jersey's statute was properly applied.
 
 
 39
 We believe that the residence of plaintiff's decedent in New Jersey gives New Jersey a substantial interest. In Raskulinecz v. Raskulinecz, 141 N.J.Super. 148, 357 A.2d 330 (1975), the New Jersey statute was applied. There, a wife sued a husband, both New Jersey residents, for injuries sustained in a car accident in Ontario. Although the family moved after the law suit commenced, the court stated that New Jersey had a "special interest" in them at the inception of the case and that Ontario had no interest in them. 357 A.2d at 332. Heavner was described as establishing a "limited and special exception" which was not applicable. Id. at 333. See also Mellk v. Sarahson, 49 N.J. 226, 229 A.2d 625 (1967) (Ohio guest statute not applied partially because of New Jersey's interest in protecting its residents).
 
 
 40
 This court recently stated that New Jersey has a "strong interest in protecting compensation rights of its domiciliaries . . . ." Schum v. Bailey, 578 F.2d 493 (3d Cir. May 26, 1978). In that case, New Jersey's statute of limitations was held to apply where a New Jersey resident sued a New York doctor alleging negligent treatment in New York.
 
 
 41
 In Henry v. Richardson-Merrell, Inc., 508 F.2d 28 (3d Cir. 1975), the plaintiff sought damages from a drug manufacturer as a result of his mother's use of thalidomide. Plaintiff was not a New Jersey resident and the New Jersey rule was not applied. The court did state, however, that "the longer New Jersey statute of limitation in Heavner was probably enacted with a view toward protecting New Jersey citizens in whom the legislature had an interest." Henry, supra at 33.
 
 
 42
 This Court recently construed Heavner as requiring a balancing of the factors elucidated there. Allen v. Volkswagen of America, Inc., 555 F.2d 361 (3d Cir. 1977). Chief Judge Seitz, concurring, stated that whenever New Jersey has a substantial interest in applying its own law, it would apply its own limitations statute without balancing the other factors. We conclude that New Jersey's interest in applying its own law is sufficiently substantial to outweigh the other factors mentioned. Thus New Jersey's statute of limitations was properly applied.
 
 
 43
 3. U.S. Steel's Right of Contribution from Pangborne.
 
 
 44
 The parties do not contest that Pennsylvania law allows contribution and New Jersey law does not. U.S. Steel argues that the district court improperly applied New Jersey law. The two leading New Jersey cases clearly indicate that New Jersey law should be applied here. Since the two cases rely on different reasoning, we will recount briefly the facts and analysis of both cases.
 
 
 45
 Breslin v. Liberty Mutual Insurance Co., 125 N.J.Super. 320, 310 A.2d 527 (Law Div.1973) Modified on other grounds, 134 N.J.Super. 357, 341 A.2d 342 (App.Div.1975), Aff'd, 69 N.J. 435, 354 A.2d 635 (1976), involved two separate cases with parallel factual settings. In both cases, a New Jersey resident, employed in New York, was injured in a New Jersey car accident. Benefits were paid by the New York employer's insurance carriers. The injured parties then recovered damages from third parties. The issue presented was what subrogation rights did the insurance companies have against the injured parties with respect to the third party recoveries. Under New York's workmen's compensation law, the carriers would be entitled to full subrogation of any amount exceeding the amount of benefits paid after deducting attorneys' fees and expenses. The carriers' subrogation rights under New Jersey law would be more limited. The court concluded that New York law should be applied stating: "(F)undamental fairness as well as the need for certainty of result commits our courts to look to the laws of the state pursuant to which the benefits were paid to determine questions affecting the essential rights of the employers, co-employees, as well as insurance carriers. See Stacey v. Greenberg, 9 N.J. 390, 88 A.2d 619; Privetera v. Hillcrest Homes Inc., (29 N.J.Sup. 591, 103 A.2d 55 (Law Div.1954)); But see, Wilson v. Faull, 27 N.J. 105, 141 A.2d 768 (1958)." Breslin, supra, 125 N.J.Super. at 325, 310 A.2d at 530. (footnote omitted).[11]
 
 
 46
 In Wilson v. Faull, 27 N.J. 105, 141 A.2d 768 (1958), the other leading New Jersey case, the plaintiff worked for a subcontractor who carried workmen's compensation insurance under the New Jersey act. The general contractor carried insurance under the Pennsylvania act. Plaintiff had recovered benefits from the subcontractor and then initiated suit against the general contractor. Pennsylvania law provided the general contractor with immunity from such a suit while New Jersey law did not. Even though benefits had been received under the New Jersey act, the court applied Pennsylvania law because the general contractor was insured pursuant to that law. The court stated:
 
 
 47
 "(W)here the injured employee seeks to maintain a common law tort action against his employer in one of two or more states having a legitimate interest in the work-injury, the forum has almost invariably applied the law of the state in which the employer has provided compensation insurance and whose law granted such employer, immunity from common law negligence actions by the employee . . . ."
 
 
 48
 Wilson v. Faull, supra, 27 N.J. at 117, 141 A.2d at 775.
 
 
 49
 Thus Breslin and Wilson describe two theories for determining which state's workmen's compensation law controls. Breslin says to look to the law of the state under which the benefits were paid. Wilson says look to the law of the state under which the employer who is being sued is insured. Here, Pangborne was insured under New Jersey law and paid benefits under that law. Thus, under either theory, New Jersey law should be applied with the result that Pangborne
 
 
 50
 is not liable for contribution. 4. Whether Airco is Immune
 
 
 51
 From Suit by Draper Because It is a Statutory Employer.
 
 
 52
 The parties agree that Pennsylvania law determines whether Airco is immune from suit by Draper. See Wilson v. Faull, supra. As stated in Pape v. Smith, 227 Pa.Super. 80, 83, 323 A.2d 856, 857 (1974), Pennsylvania applies a five part test to determine whether a general contractor is immune for suit as a statutory employer:
 
 
 53
 To enjoy immunity against a common law action a general contractor must meet a number of requirements so as to be within the Act's definition of a "Statutory employer." Five elements have been enumerated by the Pennsylvania Supreme Court in McDonald v. Levinson Steel Co., 302 Pa. 287, 294-295, 153 A. 424 (1930), and each must be present to bring the general contractor within the provisions of the workmen's compensation act:
 
 
 54
 (1) An employer who is under contract with an owner or one in the position of an owner.
 
 
 55
 (2) Premises occupied or under the control of such employer.
 
 
 56
 (3) A subcontract made by each employer.
 
 
 57
 (4) Part of the employer's regular business entrusted to such subcontractor.
 
 
 58
 (5) An employee of such subcontractor.
 
 
 59
 The central issue here is whether Airco had control of the premises. Airco concedes that it did not have control of the mill in which Draper was actually working at the time of his death, but contends that it had control of the temporary facility where much of Pangborne's work was to be done. One may have control of premises without having possession. Hattersley v. Bollt, 512 F.2d 209, 218 (3d Cir. 1975). One must, however, have control over the premises on which the accident occurred. That Airco had control over nearby premises is not sufficient. Therefore, Airco's concession that it did not have control over the mill area where Draper was killed is fatal to its argument that it is a statutory employer.
 
 
 60
 Airco's reliance on Cooper v. Heintz Manufacturing Co., 385 Pa. 296, 122 A.2d 699 (1956), as establishing its immunity from suit is misplaced. That case provides no immunity for an employer who does not otherwise qualify as a statutory employer. As just discussed, Airco does not.
 
 
 61
 5. Must Pangborne Indemnify Airco.
 
 
 62
 Term and condition number nine of the contract between Airco and Pangborne reads as follows:
 
 
 63
 9. The Contractor shall indemnify Airco and hold it harmless from and against any and all loss, cost, damage or expense of every kind and nature (including, without limitation, court costs, expenses and reasonable attorneys' fees) arising out of injuries to or death of persons (including, without limitations, Airco, the Contractor and any subcontractor and their respective employees, agents, licensees and representatives) or damage to or destruction of property (including, without limitation, property of Airco, the Contractor and any subcontractor, and property of their respective employees, agents, licensees and representatives), in any manner caused by, resulting from, incident to, connected with or growing out of performance of the Contract, unless caused solely by the negligent acts or omissions of Airco, or its employees, agents, licensees or representatives.
 
 
 64
 Although the contract was signed on October 9, 1970 and the accident occurred on September 23, 1970, paragraph five of the contract provides that work shall begin on August 15, 1970 and paragraph 3 provides: " All work to be performed hereunder shall be performed strictly in accordance with this Contract and said Exhibits and in accordance with the terms and conditions printed on the reverse side hereof." The above indemnification provision is one of these terms and conditions. Thus, it is clear that the indemnification provision applies to the work done under the contract but prior to signing. Neither Pangborne nor Airco challenged the district court ruling that Pennsylvania law controls this issue. Pennsylvania courts will enforce a contractual provision that unambiguously indemnifies a party against its own negligence. E. g., Phillippe v. Rhoads, 233 Pa.Super. 503, 336 A.2d 374 (1975). This provision is unambiguous. Airco, thus, has a right to indemnification from Pangborne unless Airco is found to be the only negligent party. Therefore, we will not discuss Airco's claim for common law indemnity from Pangborne.
 
 
 65
 6. Whether Employers Can Be Liable to Employees of Independent Contractors Under Restatement 2d of Torts, Sections 410, 414 and 416.
 
 
 66
 Airco and U.S. Steel argue that under Restatement (2d) of Torts, Sections 410, 414 and 416, employers of independent contractors are liable only to third parties and not to employees of independent contractors. The law of Pennsylvania, however, is to the contrary. See Byrd v. Merwin,456 Pa. 516, 317 A.2d 280 (1974) (employer held liable to employee of general contractor under § 414); Gonzalez v. U. S. Steel Corp., 248 Pa.Super. 95, 374 A.2d 1334 (1977) (evidence held sufficient to support verdict in favor of contractor's employee under §§ 410 and 416 among others, but retrial granted on other grounds); Hargrove v. Frommeyer & Co., 229 Pa.Super. 298, 323 A.2d 300 (1974) (employer liable to employee of independent contractor under § 416).
 
 
 67
 7. Assumption of Risk.
 
 
 68
 The trial judge instructed the jury that Draper did not voluntarily assume the risk of the injury if he undertook the work on the energized line in "fear of dismissal or fear of economic hardship resulting from refusal to do hot taps." Although no Pennsylvania case faces this issue directly, we agree with the district court that this is a proper prediction of the course of Pennsylvania law. In cases presenting factual patterns similar to that here, Pennsylvania courts have allowed recovery without discussion of the assumption of risk issue. See, e. g., McDonough v. United States Steel Corp., 228 Pa.Super. 268, 324 A.2d 542 (1974); Hargrove v. Frommeyer & Co., supra; Jacobini v. I.B.M. Corp., 57 D. & C.2d 8 (Phila.Cty.), Aff'd, 222 Pa.Super. 750, 294 A.2d 756 (1972).
 
 
 69
 Restatement (2d) of Torts, Section 496 E(1), provides, "A plaintiff does not assume a risk of harm unless he voluntarily accepts the risk." See generally Ferraro v. Ford Motor Co., 423 Pa. 324, 223 A.2d 746 (1966) (discussing comment a to Section 496 E). One who undertakes a dangerous work task for fear of being fired if he or she refuses can hardly be said to have undertaken the risk voluntarily. To hold that economic duress of this sort does not vitiate the voluntariness of an assumption of risk would not only ignore reality but would also greatly decrease the likelihood of employees' obtaining just compensation in cases such as this.
 
 
 70
 In Hennigan v. Atlantic Refining Co., 282 F.Supp. 667 (E.D.Pa.1967) Aff'd, 400 F.2d 857 (3d Cir. 1968), Cert. denied, 395 U.S. 904, 89 S.Ct. 1739, 23 L.Ed.2d 216 (1969), the district court, applying Pennsylvania law, stated "It cannot be said, where a man is lawfully engaged in his work, and is in danger of dismissal if he leaves his work, that he wilfully incurs any risk which he may encounter in the course of such." Id. at 681, quoting Thrussell v. Handyside, 20 Q.B.D. 359, 367 (1888) (concurring opinion).
 
 
 71
 Pennsylvania courts have recognized an exception to the general rule that a person who ventures into a dark area is contributorily negligent as a matter of law where there is evidence of "compelling necessity." See Bierstein v. Whitman, 360 Pa. 537, 62 A.2d 843 (1949).[12] By analogy, a workman who ventures to work on a dangerous assignment because of the compelling necessity to maintain his job and provide for his family should not be deprived of his right to compensation for injuries he suffers as a result.
 
 
 72
 Counsel for U.S. Steel points us to Comment (b) to Section 496 E of the Restatement which provides:
 
 
 73
 b. The plaintiff's acceptance of the risk is to be regarded as voluntary even though he is acting under the compulsion of circumstances, not created by the tortious conduct of the defendant, which have left him no reasonable alternative. Where the defendant is under no independent duty to the plaintiff, and the plaintiff finds himself confronted by a choice of risks, or is driven by his own necessities to accept a danger, the situation is not to be charged against the defendant. Thus a plaintiff who is forced to rent a house which is in obvious dangerous condition because he cannot find another dwelling, or cannot afford another, assumes the risk notwithstanding the compulsion under which he is acting.
 
 
 74
 We do not believe, however, that this comment is applicable to the facts here. Defendants here were under an independent duty to Robert Draper. Also we cannot say that the compulsion under which Draper acted (assuming the jury finds such compulsion) was so divorced in origin from the tortious conduct of the defendant to make the first sentence of the comment applicable here. Thus, for the above reasons, we hold that economic duress can vitiate the voluntariness of an assumption of risk.
 
 
 75
 Other issues raised on this appeal depend heavily on the factual determinations of the jury. Since these matters will have to be redetermined, we will not now discuss these issues.
 
 
 76
 The judgment below in favor of plaintiff will be vacated and the case will be remanded for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Louis C. Bechtle, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Plaintiff is a New Jersey resident. U.S. Steel is a Delaware corporation and its principal place of business is outside of New Jersey. Airco is a New York corporation and its principal place of business is outside of New Jersey. Amended Complaint and Answers of U.S. Steel and Airco. Pangborne's residence is not of significance since it was dismissed as a direct party at the outset and is only a third-party defendant. See 3 Moore's Federal Practice P 14.26
 
 
 [2]
 Counsel for the defendants objected to plaintiff's counsel's remarks at the conclusion of the closing argument and requested certain curative instructions. The trial judge refused to give those instructions, but asked counsel to put them in writing and said that he would include them in the charge to the jury if appropriate. Motions, joined in by Pangborne, were filed by U.S. Steel and Airco asking for special instructions or mistrial. These instructions were not given although there was a curative instruction. See note 9 Infra. This issue was subsequently raised by all defendants in their motions for judgment notwithstanding verdict, or in the alternative, for a new trial
 
 
 [3]
 Airco argues that this contract was for work on the permanent facility while the deceased was doing work on a temporary facility and therefore the references to the amount of this contract were misleading. Since the record is not completely clear on this issue, we do not rely on this alleged impropriety in reaching our conclusion
 
 
 [4]
 DR 7-106(C)(4) provides:
 (C) In appearing in his professional capacity before a tribunal, a lawyer shall not:
 (4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein.
 
 
 [5]
 Counsel has attempted to justify this by referring to a stipulation that the children, if they were called, would substantiate the testimony of their mother. This does not excuse reference to a discussion not in the record
 
 
 [6]
 Counsel used this improper reference as a springboard to further prejudicial references to the Draper children. Counsel speculated that the deceased had agreed to do the hot tap because he did not want to tell his wife, "Hon, I don't have a job. We have to watch the food bill this week with the kids."
 
 
 [7]
 DR 7-106(C)(6) provides:
 (C) In appearing in his professional capacity before a tribunal, a lawyer shall not:
 (6) Engage in undignified or discourteous conduct which is degrading to a tribunal.
 
 
 [8]
 Our knowledge of these gestures comes from plaintiff's counsel's own demonstration at oral argument as well as from the statements by defense counsel in their briefs and at argument
 
 
 [9]
 The following is the text of that instruction:
 Ladies and gentlemen, I may say at the outset I should mention during the course of his summation, Mr. Healey became a bit emotional which is perhaps understandable given the circumstances of this case and he did, at times, project his personal views and opinions. He did impliedly suggest the existence of a conspiracy amongst the defendants and perhaps even amongst the defendants' attorneys, and he did make reference to the wealth of the various corporate defendants, none of which statements are appropriate.
 I am sure you all recognize that this case is not to be decided on any basis other than the evidence presented at trial. It is not to be decided on the statements of any of the lawyers involved in this case as such.
 
 
 [10]
 Although the court did finally uphold its power to promulgate the prejudgment interest rule, its resolution of the issue did not hinge on the substantive-procedural dichotomy
 
 
 [11]
 The language quoted here is from the trial court opinion. This part of its holding was affirmed on appeal without substantial discussion. Stacey v. Greenberg, supra, 9 N.J. at 397, 88 A.2d at 622, did not directly "present the complex problem of the application of conflicting workmen's compensation acts to an accident with which two or more states may have some legitimate concern . . . ." Privetera v. Hillcrest Homes, supra, does provide support for the theory that the state law under which workmen's compensation benefits are received controls on the other issues related to workmen's compensation remedies. Although Wilson v. Faull, supra, is cited with a "but see," its analysis supports the application of New Jersey law on the facts here as the ensuing discussion will reveal
 
 
 [12]
 In Just v. Sons of Italy Hall, 240 Pa.Super. 416, 368 A.2d 308 (1976), a woman was injured by falling down stairs while walking through a dark hallway in search of a rest room. The trial court found her contributorily negligent as a matter of law. Although the Superior Court affirmed, three judges dissented on the theory that if the plaintiff "felt great physical urgency to get to the restroom" and if she had not proceeded far down the hallway, the question of contributory negligence would be for the jury. 240 Pa.Super. at 431, 368 A.2d at 317. The concurring judge also indicated that necessity may have "vitiated the implied assumption of the risk," but concurred in the result because he felt the plaintiff's failure to inquire whether the area was safe or could be lighted justified the dismissal. 240 Pa.Super. at 429-30, 368 A.2d at 316. Thus four of the seven judges expressed the view that the physical need to reach the restroom could vitiate the voluntariness of plaintiff's assumption of the risk. Although the dissenters defined the issue in terms of contributory negligence, the defenses of assumption of the risk and contributory negligence are essentially the same in this context. If this need to relieve oneself may vitiate the voluntariness of an assumption of risk, it would be strange, indeed, if the need to support one's self and one's family were not considered to be of at least equal urgency