**COMMERCIAL CREDIT BUSINESS
LOANS, INC., Plaintiff,**

v.

**Robert I. MARTIN, et al., Defendants.**

**Civ. A. No. 76–812.**

United States District Court,
E.D. Pennsylvania.

Jan. 10, 1984.

On Motion for Disqualification of
Counsel June 11, 1984.

Leon Forman, Philadelphia, Pa., for plaintiff.

Paul Rosen, Philadelphia, Pa., for defendants.

## OPINION

DITTER, District Judge.

Following a trial which lasted 32 days, the jury returned a verdict against the plaintiff, Commercial Credit Business Loans, Inc. (CCBL), on its complaint to recover on a personal guaranty and in favor of defendant Robert Martin on his counterclaim.[1] The jury awarded Robert Martin $4,000,000. in compensatory damages and $1,000,000. in punitive damages. Presently before me are the plaintiff's motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial. For the reasons that follow, I will deny plaintiff's motion for judgment notwithstanding the verdict but grant its motion for a new trial.

▮▮▮ Where a party moves for a judgment notwithstanding the verdict and for a new trial, the court must rule on both motions. *Universal Computer Systems, Inc. v. Medical Services Ass'n of Pennsylvania,* 474 F.Supp. 472, 475 (M.D.Pa.1979), *aff'd* 628 F.2d 820 (3d Cir.1980). The applicable standard for the motions are distinctly different. In ruling on a motion for judgment notwithstanding the verdict the court "must expose the evidence to the strongest light favorable to the party against whom the motion is made and give him the advantage of every fair and reasonable inference." *Danny Kresky Enter-*

---

**1.** The jury found in favor of CCBL on defendant Margot Martin's counterclaim and in favor of three CCBL employees, H. Milton Amos, William Gilleland and Richard McDonald, on the Martin's third-party complaint.

*prises Corp. v. Magid,* 716 F.2d 206, 209 (3d Cir.1983), *quoting Inventive Music Ltd. v. Cohen,* 617 F.2d 29, 31 (3d Cir.1980). A judgment n.o.v. should not be granted unless, based upon the entire record, there is insufficient evidence for a reasonable, fair-minded juror, in the exercise of impartial judgment, to return such a verdict. *See Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888, 891 (4th Cir.1980).

In contrast, a motion for a new trial goes beyond a mere inquiry into the sufficiency of the evidence. "Even where there is 'substantial evidence' the trial judge may set aside a verdict for the reason that it is against the clear weight of the evidence, or that damages are excessive, or that substantial errors have occurred in the admission or rejection of evidence." *Keystone Floor Products Co. v. Beattie Manufacturing Co.,* 432 F.Supp. 869 (E.D.Pa.1977). In addition, even where a jury could have permissibly drawn the inference it did from the record, a new trial may be ordered where counsel engaged in improper conduct which had a prejudicial effect upon the jury. *See Draper v. Airco, Inc.,* 580 F.2d 91 (3d Cir.1978).[2] In such circumstances, the trial court may set aside the verdict in order to prevent a miscarriage of justice. In the present case, a new trial is required because of a persistent pattern of misconduct by defendants' counsel that continued despite my numerous admonitions.

## I. Facts

Viewed in the light most favorable to the defendants, the following facts emerged at trial: between September, 1973, and December, 1973, CCBL made a series of loans totaling in excess of $2 million to Rimar Manufacturing, Inc. (Rimar) and its wholly-owned subsidiary, Pier 7, Inc. (Pier 7). Rimar was a public company with approximately 2000 stockholders. Martin was a substantial shareholder of Rimar, as well

as its president and that of Pier 7. Shortly after the closing of the original loan transactions, CCBL became concerned over the expansion policy undertaken by Martin. Soon after Rimar acquired a new company, Rimar of Connecticut, in October, 1974, CCBL decided to terminate its financing agreement with Rimar and Pier 7. John Romoser, a CCBL account executive who had formerly handled the Rimar account, testified that when CCBL officials learned that Rimar had purchased the Connecticut enterprise, "management was extremely upset" and stated that "they were going to crucify the S.O.B." Romoser further testified that CCBL intended to continue its "liquidation" program until Martin was bankrupt. As part of this program, CCBL began to reduce the amount that Rimar could borrow from CCBL while simultaneously collecting Rimar's accounts receivable. The net result was a severe diminution of Rimar's cash flow which created a substantial likelihood that Rimar would be forced into bankruptcy.

In early September, 1975, Rimar, Pier 7, Martin, and his wife brought an action against CCBL and three of its officers in federal court and obtained a temporary restraining order allowing Rimar to withhold certain accounts receivable from CCBL. The action was settled by way of a stipulation which is the foundation of the present action. This document modified the terms of the original loan agreement and provided, *inter alia,* that CCBL would continue to provide financing for a period of up to six months during which Rimar would seek an alternative source of financing. *See* ¶ 3 of Stipulation and Order. In addition, CCBL agreed not to "reinstitute any program of liquidation against any of the above Plaintiffs, and no new procedure will be instituted by CCBL during the term of this Stipulation and Order which would reduce the availability due Plaintiffs" unless

---

**2.** In this circuit, the appropriate inquiry is whether there is a "reasonable probability" that the jury's verdict has been influenced by the improper conduct of counsel. *Draper v. Airco, Inc.,* 580 F.2d at 97; *Ayoub v. Spencer,* 550 F.2d

164, 170 (3d Cir.), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977). *See also City of Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749, 756 (6th Cir.1980); *Twachtman v. Connelly,* 106 F.2d 501, 508–09 (6th Cir.1939).

10 days notice was given. ¶ 18 of Stipulation and Order. In return, Rimar, Pier 7, and the Martins agreed *inter alia*, to release CCBL from liability by reason of CCBL's previous actions. *See* ¶ 10 of Stipulation and Order. In addition, the Martins agreed to provide a $250,000. personal guaranty for the obligations of Rimar and Pier 7. *See* ¶ 16 of Stipulation and Order.

Notwithstanding the agreements set forth in the Stipulation and Order, disputes continued to arise between the parties. The disagreements centered upon CCBL's procedures in determining the collateral value of accounts receivable and inventory under the loan agreements. The net result of CCBL's actions was to reduce the availability of funds which Rimar could borrow. Because they were unable to continue as viable enterprises in the absence of this financing, Rimar and Pier 7 filed petitions under Chapter XI of the former Bankruptcy Act on January 12, 1976.

In March, 1976, CCBL filed the present action against Mr. and Mrs. Martin alleging that because of the failure of Rimar and Pier 7 to repay their obligations timely, the Martins were indebted to CCBL in the amount of $250,000. under the terms of their personal guaranty of September 12, 1975. In response, the Martins filed a counterclaim, alleging that during the period of September 12, 1975, to January 12, 1976, CCBL had tortiously violated the terms of the Stipulation and Order in a deliberate attempt to harass and cause financial difficulty to Rimar. The defendants alleged that as a result of CCBL's actions, they suffered substantial damages.[3]

Throughout this entire period, Rimar, Pier 7, and the Martins were represented by Paul Rosen, Esquire. Mr. Rosen counselled and advised them during the continuing problems with CCBL. He wrote letters, made phone calls, and had personal conferences. He appeared in court on behalf of Rimar and the Martins. It was Mr. Rosen who negotiated the settlement of the prior action. He was in constant, often daily contact with the Martins and was intimately acquainted with all that took place. He knew of the difficulties between the Martins and CCBL, not second hand or in broad outline, but first hand and in detail. Unfortunately, he was also their trial counsel in the present case.

## II. Motion for Judgment Notwithstanding the Verdict

CCBL has asserted three grounds in support of its motion for judgment notwithstanding the verdict: first, as a shareholder and officer of Rimar, Martin may not maintain an individual action against CCBL for what amounts to a primary wrong to the two corporations (Rimar and Pier 7); second, that the defendants failed to prove that during the period of September 12, 1975, through January 12, 1976, CCBL had engaged in any tortious conduct; finally, that Martin failed to establish any link between CCBL's conduct and his alleged damages. Each contention is without merit.

With regard to the first issue, CCBL asserts that Martin, in his capacity as a stockholder and officer of Rimar, lacks standing to maintain this action. CCBL contends that a claim for breach of a contract with a corporation or for the tortious impairment of its business is vested solely with the corporation, not its stockholders or officers. I have no quarrel with this statement of the law. *See e.g., Pitchford v. Pepi, Inc.,* 531 F.2d 92, 97 (3d Cir.1975), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727, 732 (3d Cir.1970),

---

**3.** As I instructed the jury, the Martins' claim was one essentially sounding in tort, rather than contract. The Martins' theory of recovery was that CCBL was liable to them because CCBL had breached the terms of the Stipulation and Order in a deliberate attempt to harm the Martins. I explained in some detail that the defendants could not recover simply by proving that certain contractual terms had been breached. Rather, they could recover only if the jury found that the terms had been breached with the deliberate intent to injure the Martins. *See* Tr. 32–31 to 38.

*cert. denied,* 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *ITT Diversified Credit Corp. v. Kimmel,* 508 F.Supp. 140, 143–45 (N.D.Ill.1981); *Commercial Credit Development Corp. v. Scottish Inns of America, Inc.,* 69 F.R.D. 110, 116–17 (E.D.Tenn. 1975). This is, however, not the basis upon which Martin's claim is predicated. Martin has standing to maintain this action because he was a party to the September 12, 1975, Stipulation and Order, the terms of which he has alleged CCBL breached with the deliberate intent of causing injury to him. As such, Martin has an independent basis upon which to bring this action, separate and apart from his status as president and shareholder of Rimar.[4] *See, e.g., Buschmann v. Professional Men's Association,* 405 F.2d 659, 662 (7th Cir.1969); *Stewart Coach Industries, Inc. v. Moore,* 512 F.Supp. 879, 888 (S.D.Ohio 1981).

CCBL also argues that judgment n.o.v. must be granted because Martin failed to prove that between the period of September, 1975, and January, 1976, CCBL had engaged in any tortious conduct. Viewing the evidence in a light most favorable to Martin, I find that there is substantial evidence to support the jury's determination that CCBL violated the terms of the Stipulation and Order with the specific intent of causing injury to him.[5]

Finally, CCBL asserts that Martin failed to establish any connection between its post-stipulation actions and his injuries. I disagree. The record adequately supports the jury's finding that as a result of CCBL's refusal to provide sufficient additional financing to which Rimar was entitled under the terms of the Stipulation and Order, Rimar was unable to meet its operating expenses and therefore was forced to file for bankruptcy on January 12, 1976. Consequently, Martin's substantial stock holdings in Rimar were rendered worthless, he became personally liable for numerous other corporate debts and Rimar's outstanding taxes, and his home and other properties were sold at sheriff's sale. In addition, I cannot say that the jury's award of punitive damages is without foundation. In sum, viewed in a light most favorable to the defendant, the evidence is sufficient to support the jury's award of both compensatory and punitive damages.[6]

### III. Motion for a New Trial

Despite my conclusion that no adequate grounds exist for entering a judgment notwithstanding the verdict, I am forced to grant a new trial. This result is unfortunate because this action has already consumed an inordinate amount of the parties', counsels', and the court's time and resources. However, due to defense counsel's wholly improper conduct, this result is inescapable.

During the course of this protracted trial, I found it necessary to admonish counsel repeatedly for his continuous pattern of misbehavior. Among his more serious transgressions were his insistence on testifying, his persistence in stating his personal opinions regarding witnesses' testimony, and his repeated aspersions directed towards opposing counsel. Counsel's behavior was particularly egregious during his summation. In reviewing the record, I have noted at least 23 instances of improper statements in this relatively brief span. Again, these comments include testifying

---

4. This finding applies with equal force to CCBL's additional argument that Martin's status as a guarantor of Rimar's obligations is insufficient to confer standing to sue. Again, I have no occasion to disagree with this statement. *See, e.g., Mullins v. First National Exchange Bank of Virginia,* 275 F.Supp. 712, 722 (W.D. Va.1967). However, for the reason stated above, it has no bearing upon the present case.

5. The following acts by CCBL are among those in support of the jury's award: placing net and bill accounts into special margin; rejecting the no-offset letters; refusing to make an upward adjustment in the loan value of Rimar's inventory; and increasing the frequency of its audits and verifications.

6. Given my disposition of this action, it is unnecessary to address CCBL's contention that the amount of damages is excessive. It is entirely possible, however, that the jury's calculations were inflated by defense counsel's improper actions.

in the guise of arguing (Tr. 32–79; –93; –229; –231), giving his personal opinion regarding the justness of his clients' case (Tr. 32–33; –103; –104; –105; –113; –125; –126; –229; –232; –238), interjecting his views about the credibility of witnesses and their testimony (Tr. 32–70; –76; –77; –80; –99; –231), and making reference to the size and resources of CCBL (Tr. 32–229; 231; –233). Counsel's improprieties began with his initial remarks to the jury, ("Now you have to understand that I really believe that Mr. Martin is right and so forth." Tr. 32–33), and continued unabated throughout his closing speech. Counsel later stated, "I say no one has the right to use credit practices the way they did. ... I say they had no right to harass him. I say the behavior is outrageous. ... That's outrageous behavior. It's horrible behavior. It's up to you to stop it. It's up to you to right it." (Tr. 32–125 to 126). While a litigant has a right to expect his attorney to argue forcefully based upon the evidence, counsel went far beyond the facts and proffered his sentiment about CCBL's actions.[7] Such opinions were uncalled for and should not have been placed before the jury.[8] Moreover, counsel's expression of indignation and outrage could only serve to lead the jury away from a decision based upon a fair and impartial review of the evidence.

After counsel had concluded his summation and prior to his rebuttal, I admonished him outside the presence of the jury for his conduct. (Tr. 32–139 to 141). Notwithstanding my warning, counsel's improper remarks continued with renewed vigor dur-ing his rebuttal. Illustrative of his actions is the following excerpt where he succeeded in combining several improper comments:

> With respect to Mr. Martin's dreams, I think he has a right to them. I think that if he had dreamed about where his company was going to be bigger than the Army, he has a right to that dream, and I don't believe because Commercial Credit has lots of money and because they are rich they have a right to take that dream. I don't believe it.
>
> I believe if somebody takes an account away from somebody and takes rights away from somebody and said something to them that they shouldn't do, it doesn't matter how much money they had. I really don't believe that Mr. Martin in any case would stand back and take what happened to him, regardless of the fact it was Commercial Credit.
>
> Mr. Martin could have gone bankrupt and gotten rid of all of his claim and not been here and not have the obligations upon him and not had any of them. I think it's absolutely absurd to label Commercial Credit because they have money that Mr. Martin's claim is fictitious. They have power too and they used it. (Tr. 32–229).

As I previously explained, counsel's personal beliefs regarding his client's dreams had no place in his argument to the jury. In addition, his reference to the size and wealth of CCLB was a transgression that cannot be condoned.[9] *See, e.g., City of*

---

**7.** At other points in his closing remarks, in reference to CCBL's conduct, defense counsel stated, "I say that was unreasonable .... I say the way they did it was wrong." (Tr. 32–105) and "I think it's illegal ...." (Tr. 32–113). Such comments to a jury by an attorney are blatantly improper.

**8.** Similarly, counsel's opinion as to whether testimony is "incredible," (*see, e.g.,* Tr. 32–77: "Now its incredible to me ...") or unbelievable (*see, e.g.,* Tr. 32–70: "Now, that's hard for me to believe ...") is not pertinent. The evaluation of the testimony is a matter within the province of the jury and should not be influenced by counsel's personal convictions. "[T]he Canons of Ethics ... forbid an advocate from arguing to the jury *his* opinion or *his* appraisal of the issues, of the evidence, or of the credibility of a witness. It is unprofessional conduct ... for counsel either to vouch for his own witnesses or to categorize opposing witnesses as 'liars'; that issue is *for the jury."* *Olenin v. Curtin & Johnson, Inc.,* 424 F.2d 769 (D.C.Cir.1968), *cert. denied,* 394 U.S. 993, 89 S.Ct. 1485, 22 L.Ed.2d 769 (1969) (emphasis in original).

**9.** Subsequently, counsel made a similarly improper remark in which he not only testified to the size of CCBL and its affiliation with Control Data, a fact that was not in evidence, but also

*Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749 (6th Cir.1980); *Draper v. Airco, Inc.*, 580 F.2d 91 (3d Cir.1978); *Koufakis v. Carvel*, 425 F.2d 892 (2d Cir.1970). As the Third Circuit stated in *Draper*, "[J]ustice is not dependent upon the wealth or poverty of the parties and a jury should not be urged to predicate its verdict on a prejudice against bigness or wealth." 580 F.2d at 95.

Later in his rebuttal, counsel again extended himself beyond the permissible bounds of advocacy in commenting upon certain witnesses who had testified on behalf of his client. He stated, "And I'm proud of Mr. Romoser to stand up to that company, and I'm proud of Mr. Herr who ....." (Tr. 32–238) At this point, I was forced to interrupt counsel and again warn him about his continued misconduct.

The numerous misdeeds by defense counsel are in direct conflict with Disciplinary Rule 7–106(C) of the Code of Professional Responsibility which states, in pertinent part:

(C) In appearing in his professional capacity before a tribunal, a lawyer shall not:

\*   \*   \*   \*   \*   \*

(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.

(4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein.

\*   \*   \*   \*   \*   \*

(6) Engage in undignified or discourteous conduct which is degrading to a tribunal.

Throughout his summation, Mr. Rosen expressed his personal opinion about his clients' cause and vouched for the credibility of their witnesses. He went far beyond arguing for their position based upon his analysis of the evidence. These problems were no doubt a product of Mr. Rosen's decision to try this case himself. As evidenced by his summation and his conduct throughout the trial, this decision was a serious error in judgment. Because he was counsel to Rimar and the Martins at the time the critical events took place, he had knowledge of facts which made him a potential, and possible crucial witness for his clients. He is a skilled advocate, but he found it impossible to lay aside the role of a partisan witness. His intimate knowledge of the facts and his personal involvement in the scenario that unfolded placed him in a position where his advocacy became testimony which escaped cross-examination. It is elementary that counsel should avoid assuming the dual roles of lawyer and witness. *See* DR 5–102(A): "If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial ...." Unfortunately, Mr. Rosen provided succinct illustrations of how each of these Disciplinary Rules may be violated.

Counsel's improper remarks are not grounds for a new trial *per se*. I must also decide whether these actions were so prejudicial that there is a "reasonable probability" that the verdict was influenced by them. *See Draper v. Airco, Inc.*, 580 F.2d at 94, 97; *Ayoub v. Spencer*, 550 F.2d at 170. This is not a case where the comments have been made infrequently or were isolated from one another by other-

vouched for the credibility of one of his witnesses.

"I think it takes an awful lot of integrity for someone to walk into this courtroom knowing Commercial Credit is the biggest finance company owned by Control Data and testify knowing that all that computer information is available to Commercial Credit, the biggest computer bank in the world, has all the infor-

mation in their computers, and the person may have been fully aware of the risk of testifying with this information available would walk into this courtroom of his own free will and state the facts and he did state the facts." (Tr. 32–231 to 232).

Shortly thereafter, in referring to CCBL, counsel stated, "I mean, these are supposed to be the biggest collectors in the world." (Tr. 32–233).

wise acceptable behavior. A pattern of objectionable conduct by defense counsel pervaded the entire trial and was particularly flagrant during counsel's closing argument. Because this was the final occasion for the jury to hear from either the parties or their attorneys before they began their deliberations, the prejudicial impact of these final remarks was especially acute. There was no way the jury could escape the feeling that counsel's righteousness, indignation, and outrage were not those of a mere advocate advancing a point of view for a client. To the contrary, the conclusion was inescapable that Mr. Rosen, armed with first-hand knowledge, was vouching for the need to right a great wrong.

Despite the curative instructions which I gave the jury the following day, the odoriferous taint spread by counsel's frequent and grave improprieties could not have been erased. *See Draper v. Airco, Inc.,* 580 F.2d at 96–97; *Koufakis v. Carvel,* 425 F.2d 892, 904 (2d Cir.1970). Considered in their entirety, defense counsel's actions effectively deprived the plaintiff of its right to have the jury render its verdict based upon a fair and impartial review of the evidence. A new trial must be ordered.

## MEMORANDUM AND ORDER

### On Motion For Disqualification of Counsel

This action was tried to a jury which returned a verdict in the amount of $5 million in favor of defendant Robert Martin on his counterclaim. By prior order, I determined a new trial was necessary because of the improper conduct of defendants' counsel, Paul Rosen, Esquire. Presently before me are cross motions for the disqualification of opposing counsel. For the reasons that follow, I will disqualify Paul Rosen from acting as defendant's trial counsel, but permit another member of his firm, Spector, Cohen, Gadon & Rosen, to try this case. I will also refuse the motion to disqualify plaintiff's firm, Wexler, Weisman, Forman & Shapiro, as trial counsel.

### I. *Disqualification of Defendants' Counsel*

■ Plaintiff has premised its motion upon the assertion that Paul Rosen "ought to be called as a witness" by defendants and therefore his disqualification is required pursuant to Disciplinary Rule 5–102.[1] For the purposes of DR 5–102(A), an attorney "ought to be called as a witness" only where he has "crucial information in his possession which must be divulged." *Universal Athletic Sales Co. v. American Gym,* 546 F.2d 530, 539 n. 21 (3d Cir.1976), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977). The party seeking to have opposing counsel disqualified must make a clear showing that continued representation would be impermissible. *See Stanwood Corp. v. Barnum,* 575 F.Supp.

---

1. DR 5–102. Withdrawal as Counsel When the Lawyer Becomes a Witness
    (A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).
    (B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his

testimony is or may be prejudicial to his client.
The "circumstances enumerated in DR 5–101(B)(1) through (4)" provide that a lawyer may continue representation:
    (1) If the testimony will relate solely to an uncontested matter.
    (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
    (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
    (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in this particular case.

1250 (W.D.N.C.1983); *Brotherhood Railway Carmen of the United States v. Delpro Company,* 549 F.Supp. 780 (D.Del. 1982). Vague and unsupported allegations regarding the significance of an attorney's testimony will not suffice as a ground for disqualification. *See Zions First National Bank, N.A. v. United Health Clubs, Inc.,* 505 F.Supp. 138, 140 (E.D.Pa.1981).

■■■ Plaintiff has failed to carry its burden that Rosen ought to be called as a witness and thus that disqualification would be required under DR 5–102(A). In support of its motion, plaintiff relies heavily upon my prior opinion in which I stated that during the course of the first trial, Rosen proved himself to be a *"potential, and possible* crucial witness for his clients." *Commercial Credit Business Loans, Inc. v. Martin,* 590 F.Supp. 328 at 334 (E.D.Pa.1984) (emphasis added). If the case is tried the second time, as it was the first, Rosen might well have to be called as a witness. It does not follow that it has to· be tried that way, should be tried that way, will be tried that way, or that his testimony would be necessary to achieve a fair result. As a matter of fact, defendants have represented that he will not be called as a witness on their behalf,[2] and I am firmly convinced this case can be tried in a manner that will not require Rosen's testimony.

Despite my conclusion that plaintiff has not established that disqualification is required under a literal reading of DR 5–102(A), the duty to maintain the integrity of the judicial process requires the exercise of my inherent supervisory powers to order the disqualification of Paul Rosen as trial counsel. *Cf. Groper v. Taff,* 717 F.2d 1415, 1418 (D.C.Cir.1983); Local Rule of Civil Procedure 14 (District Court has inherent power and responsibility to supervise the members of its bar). The basis of my prior opinion granting a new trial was Rosen's inability to separate himself from the dual roles of attorney and witness. He became so involved with the presentation of his client's case that he testified to facts not in evidence and stated his personal opinion regarding witnesses' testimony and the justness of his client's cause. In effect, his advocacy became testimony which escaped the rigor of cross-examination. The full extent of his transgressions were detailed in my prior opinion and need not be repeated here. Suffice it to say that but for his conduct, the 32 days expended on the first trial would not have been wasted. It would be unfair to both the litigants and the court to run the risk that these errors will be repeated, thus necessitating yet another trial. In light of his prior actions, the more prudent course is to refuse to allow Mr. Rosen to try this case again. However, to avoid any hardship to defendants, I will permit his law firm to remain as trial counsel. This will give defendants the benefit of Rosen's detailed knowledge of their case during pretrial yet avoid the problems of the first trial.

## II. *Disqualification of Plaintiff's Counsel*

Having resolved the issue regarding Rosen's disqualification, I perceive little difficulty with defendant's motion for the disqualification of Wexler, Weisman, Forman & Shapiro as trial counsel. Defendants based their motion upon plaintiff's repre-

---

**2.** I harbor sincere doubts, however, whether the strictures of DR 5–102(A) may be avoided by the assertion that an attorney will not and need not testify on behalf of his client. This rule calls for disqualification where the attorney ought to testify, not where he will testify. *See Brotherhood Railway Carmen, supra,* 549 F.Supp. at 788–89; *MacArthur v. Bank of New York,* 524 F.Supp. 1205, 1208 (S.D.N.Y.1981). *But see J.D. Pflaumer, Inc. v. United States Department of Justice,* 465 F.Supp. 746, 747–48 (E.D.Pa.1979). Nonetheless, despite my reservations about its utility, I fully expect defendants to abide by their repre-

sentation that Rosen will not testify. For the sake of clarity and to avoid any potential misunderstanding, I will repeat what I said at oral argument. *If defendants subsequently decide to call Rosen as a witness, I will almost certainly disqualify the Spector, Cohen firm mea sponte. See MacArthur v. Bank of New York, supra,* 524 F.Supp. at 1209 (court has power to disqualify counsel on its own when need arises). If plaintiff then elects to have its former trial counsel, Leon Forman, Esquire, testify to rebut Rosen's testimony, I will in all likelihood also disqualify the Wexler, Weisman firm.

sentation that it would call Leon Forman, its counsel at the first trial, as a rebuttal witness in the event Rosen testified. Given defendants' representation that Rosen will not testify, the ground for defendants' motion no longer exists. Accordingly, their motion to disqualify plaintiff's counsel will be denied.