Larry EAGAN, Plaintiff,

v.

CSX TRANSPORTATION, INC., Defendant.

No. CIV. 01–40096.

United States District Court, E.D. Michigan, Southern Division.

July 14, 2003.

Steven L. Kantor, Williamsville, NY, David J. Nickola, Flint, MI, for plaintiff.

Arthur T. Lippert, Jr., Lippert & Humphreys, Saginaw, MI, for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR MISTRIAL

GADOLA, District Judge.

Before the Court is Defendant's motion for mistrial. For the reasons set forth below, the Court shall grant Defendant's motion and order a new trial in this matter.

## I. BACKGROUND

Plaintiff, a former employee of Defendant CSX Transportation, Inc., brought this action pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq. Plaintiff alleged that Defendant failed to provide him with a safe place to work, and that, as a result of Defendant's negligence, Plaintiff was injured on October 9, 1999. On that date, Plaintiff allegedly slipped and fell on a "blue flag" that was left negligently between the railroad tracks at the rail yard where he was employed.

The trial in this case commenced on October 22, 2002 and concluded on October 29, 2002. The jury awarded Plaintiff $750,000 in economic damages, sustained past, present, and future, and $1,750,000 in damages for pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for enjoyment of life, past, present, and future.

Defendant moved for a mistrial following the rebuttal argument of Plaintiff's counsel, David Nickola. Defendant's counsel, A.T. Lippert, argued that Mr. Nickola had made improper remarks to the jury during his closing and rebuttal arguments. Mr. Lippert brought this motion at a sidebar conference, out of the presence of the jury. The Court took the motion under advisement. After the jury returned its verdict for Plaintiff, Mr. Lippert renewed Defendant's motion for mistrial and requested the opportunity to submit a brief in support of the motion. The Court granted this request and permitted Plaintiff to submit a response brief. Defendant filed its supporting brief on November 8, 2002. Plaintiff filed his response brief on December 2, 2002, and Defendant filed a reply on December 5, 2002. The Court heard oral argument on Defendant's motion on May 16, 2003.

## II. LEGAL STANDARD

"[I]t is ... clear that 'counsel should not introduce extraneous matters before a jury or, by questions or remarks, endeavor to bring before it unrelated subjects, and, where there is a reasonable probability that the verdict of a jury has been influenced by such conduct, it should be set aside.'" *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir.1980) (quoting *Twachtman v. Connelly*, 106 F.2d 501, 508–09 (6th Cir.1939)). In making this determination,

> a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e. g. whether it is a close case), and the verdict itself.

*Id.*

## III. ANALYSIS

### A. FAILURE TO OBJECT

■ Defendant alleges that Plaintiff's counsel, Mr. Nickola, made a number of improper and prejudicial comments during his closing and rebuttal arguments. It is undisputed that Mr. Lippert raised no objection during Mr. Nickola's closing argument. However, Mr. Lippert objected on two occasions during Mr. Nickola's rebuttal argument, then moved for a mistrial at the conclusion of Mr. Nickola's rebuttal argument and renewed that motion upon the jury's return of its verdict. On both occasions, the Court took the motions under advisement. Plaintiff argues that Defendant has waived any objection to those comments to which Defendant did not contemporaneously object. The Court disagrees.

In *Strickland v. Owens Corning*, 142 F.3d 353 (6th Cir.1998), the Sixth Circuit rejected the plaintiff's argument that the defendant had "waived its right to appeal based upon allegedly improper remarks[ ] because it failed to object to them at trial or ask for a curative instruction." *Id.* at 358. In fact, the court in *Strickland* noted that, in a prior case, the Sixth Circuit had "found that 'the conduct of Plaintiffs' counsel was so outrageous as to warrant reversal of the verdict and [a] new trial,' despite opposing counsel's failure to object." *Id.* (quoting *Igo v. Coachmen Indus., Inc.*, 938 F.2d 650, 659 (6th Cir.1991) (reversing the verdict on other grounds)). The *Strickland* court noted, however, that "failure to object at trial to closing arguments does raise the degree of prejudice which must be demonstrated in order to get a new trial on appeal." *Id.* at 358–59 (citing *Reese v. Mercury Marine Div. of Brunswick Corp.*, 793 F.2d 1416, 1429 (5th Cir. 1986)).

The Fifth Circuit in *Reese* concluded that when a party failed to lodge a contemporaneous objection to allegedly improper argument at trial, such argument would result in reversal only upon a showing of "plain error." 793 F.2d at 1429. The court explained:

> In civil cases, a finding of plain error is "confined to the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Liner v. J.B. Talley and Co., Inc.*, 618 F.2d 327, 329–30 (5th Cir.1980). In applying the plain error standard, this Court has emphasized "our continued reluctance to address for the first time on review errors which the trial court was not given an opportunity to consider and correct ... [especially] when the errors assertedly lie in counsel's closing remarks." *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir.1975).

*Id.; accord Adams v. Campsey*, No. 86–5772, 1987 WL 36741, at *4 (6th Cir. July

9, 1987). Accordingly, following *Strickland* and *Reese*, this Court concludes that it may review for plain error those comments to which Defendant did not contemporaneously object or request a curative instruction.

### B. COMMENTS OF COUNSEL

■ Having reviewed the arguments of counsel in this case, the Court concludes that Mr. Nickola's closing and rebuttal arguments extended beyond the bounds of civility and propriety, resulting in prejudice to Defendant. Specifically, the Court finds that Mr. Nickola engaged in improper argument by: (1) repeatedly attacking the legitimacy of Defendant's safety recommendations and vocational rehabilitation program without evidence to support the conclusion that these programs were established solely for use in defense of employee lawsuits; and (2) repeatedly attacking defense witnesses, Defendant, and defense counsel with vituperative and disparaging remarks.

During his closing and rebuttal arguments, Mr. Nickola repeatedly attempted to establish that Defendant's vocational rehabilitation program had no legitimate purpose except for use in defense of employee lawsuits. Defendant argues that Mr. Nickola's comments were not supported by evidence in the record. Defendant contends that Mr. Nickola's comments raised the suggestion that Defendant's vocational rehabilitation program was part of a "conspiracy" against injured workers. Therefore, Defendant argues that there exists more than a reasonable probability that Mr. Nickola's comments on the vocational rehabilitation program adversely affected the jury's verdict. The Court agrees with Defendant's contentions.

During his closing argument, Mr. Nickola characterized Defendant's vocational rehabilitation program as a "set up," stating:

It was nice to know, ladies and gentlemen, . . . that [Defendant's vocational rehabilitation director] Bev Jackson gave us CSX.com because she's in here trying to tell you that he can do that job. She didn't do a vocational assessment. *She's better than a hired witness, they have to pay a lot of money for. She's in-house. You heard her, they take her all over the country to testify. That's a set up. I think that's pretty clear."* (T. 21) (emphasis added).

\*   \*   \*   \*   \*   \*

So you see all the smoke and mud and what's real crystal clear here about that program, and why he might be concerned. He didn't say no, but he's concerned. Why? Because she *turns it over* to the claims department—Mr. Murdock. Mr. Murdock. Yeah, turn my vocational assessment—I'm going to open up to you, go to counseling, have Mr. Murdock chew it up. We saw what that's all about. That's trustworthy. (T. 22.)

\*   \*   \*   \*   \*   \*

Understand something, you're going to hear Judge Gadola tell you about mitigation of damages, because that's what that "rehab program" is about. *So [Defendant's counsel] can come in here and use it against [Plaintiff],* and he got— but that's not what we're doing, but you wait until [Defendant's counsel] gets up here and tells you. *He's using it against him,* but you're going to hear the holy test, ladies and gentlemen, is that he's trying. The only test for mitigation of damages is that he's trying and he's being reasonable. (T. 29) (emphasis added).

Mr. Nickola made similar accusations concerning Defendant's safety recommendations:

[T]hese recommendations, what are they? *They're put on. They create them, they put them on you. It's got to be accessible. Why? Because it's nothing more than a set up piece of device that's used in a court of law. So [Defendant's counsel] can come in here, in every case where there's a slip and fall, and say look at these recommendations. Look at what we did.* He wasn't paying attention. It's all his fault and it's forced near them, so they can do that, accessible in your locker or in your bag. *That's what the company is doing here. That's exactly what that's used for.*" (T. 11) (emphasis added).

\*    \*    \*    \*    \*.    \*

*This recommendation, which is nothing more than a stink bomb they want to place on somebody, so that if they do get hurt, because they absolutely ignored the rules, they ignore safety hazards, it's nothing so they can come in here to court and do exactly what they've done.* Exactly. He'll put it back up again and you'll see that. But these are rules. We're not worried about the rules. We don't fear your rules." (T. 12–13) (emphasis added).

Finally, in his rebuttal argument, Mr. Nickola stated:

*And they whip out the recommendations, again I told you he'd do that. Assume no responsibility in the slightest and attack the injured worker. Attack him. When all else fails, vote rehab. Throw that in the hopper. Bring [Beverly Jackson] in here. Everything she sent, every letter, as I told you, as you saw what was gonna happen. It gets documented. Not because they're worried about whether he moves or not. Because it's used and it was used and he's argued it. Just as I said, remember, in court?* They're going to do this, but ah there's no proof yet and I understand that, but we still heard it because

I knew it was coming and you saw it and that's all that rehab is . . . .

(T. 70–71) (emphasis added).

In response to Defendant's arguments, Plaintiff contends that Mr. Nickola's comments were a reasonable response to Defendant's repeated suggestion that Plaintiff had not mitigated his damages. Plaintiff also denies that Mr. Nickola's comments questioned the legitimacy of the vocational rehabilitation program and argues that Mr. Nickola merely drew reasonable inferences from the evidence presented at trial. The Court disagrees with Plaintiff's assessment of Mr. Nickola's comments.

It is clear that Mr. Nickola engaged in a full-fledged attack on the legitimacy of not only the vocational rehabilitation program, but also the safety recommendations. Mr. Nickola's argument was essentially that these programs had no legitimate beneficial purpose but were rather designed exclusively for use against employees in court. Plaintiff has pointed to no place in the record where such accusations were supported with evidence. The Court concludes, therefore, that these comments, which were extraneous and highly inflammatory, could very well have influenced the jury's verdict by prejudicing the jury against Defendant.

Next, Mr. Nickola repeatedly disparaged defense witnesses, Defendant, and defense counsel with inflammatory accusations of dishonesty and impropriety. Mr. Nickola suggested throughout his arguments to the jury that Defendant's counsel, Mr. Lippert, was untruthful and had used improper tactics. For example, Mr. Nickola contrasted a witness' conclusion that the blue flag could have caused Plaintiff's accident with Mr. Lippert's opening statement:

But in opening argument, we say ladies and gentlemen that the radio did not

create a hazard, it was not a hazard. That's the lawyer talking for the company. That's not what the trainmaster told you. You think about that in this case. You think about that during the course of your deliberations. *Who is bringing this to you and who's not? Who's trying to crystallize the issues for you, and who's trying to muddy the water? You think about that.*

(T. 15) (emphasis added).

Mr. Nickola accused Mr. Lippert of improperly attempting to bias the jury with anti-union sentiment during his cross-examination of Darrell Pillen regarding the grievance procedures available to employees:

How long did we spend with Darrell Pillen, saying, "Well, what about the grievances? Let's talk about some grievances." Let's talk about some grievances. Let's go on and on about grievances for a half an hour. There is nothing in here about a grievance. But why is [Mr. Lippert] bringing that up? *Because maybe somebody is anti-union. Maybe somebody is going to think that (sic) something bad about union people. Nothing about grievances, ladies and gentlemen, but he wants to beat that dead horse in front of you. And why? I wonder why?* We're not complaining about the rules. We have to live with it.

(T. 19) (emphasis added). The Court notes that there was no evidence of any anti-union activity on the part of Defendant introduced at trial.

Mr. Nickola accused Mr. Lippert of improper tactics in his questioning of Plaintiff's physical therapist, Randy Harrison. For example, Mr. Nickola suggested that, by cross-examining Ms. Harrison, Mr. Lippert was implying that she was a "liar":

Randy Harrison, she came in and told you that he is motivated to go back to work. Talked about the pain, I don't have to go through all that again. "Peo-

ple don't try," she said, "he does." [Mr. Lippert] gets up there and says, "Well did you do any psychological tests or did you do this about motivational—have any classes-" what do you need classes for? *Did she seem like she was a liar?* Or did she seem like she was being honest here?

(T. 26) (emphasis added).

Mr. Nickola also accused Mr. Lippert of "beating up on" Ms. Harrison, and in the process disparaged Defendant's expert as a "hired gun":

She comes in here and she said she did the functional test and Larry could not return to work safely or effectively in job test finding, just as we heard before. . . . Ms. Harrison also said that sitting poses problems and Larry is (sic) plateau, it's as good as it's gonna get. *[Mr. Lippert] wants to beat up on her about a tibia and fibia (sic) fracture, but he's forgot that his own doctor, that he hired, his hired gun, thought that there was M.C.L. § surgery performed when that wasn't the case.* I point it out to him, and said, "Sir, maybe you should check your records to help him out." But *[Mr. Lippert] wants to spend a half an hour beating up on her because of that.* Wouldn't that—what big difference did that make? Whether she had the surgical report and she explained that. Nobody disagrees with her. Nobody disagrees with her, ladies and gentlemen, and neither does Dr. Narten."

(T. 26–27) (emphasis added).

Mr. Nickola suggested that, by questioning Plaintiff's expert witnesses about their fees, Mr. Lippert was accusing Plaintiff's counsel of impropriety:

I'll tell you what, if we had a psychologist that came in, guess what? How much are you getting paid to be here? *Oh, the plaintiff's lawyers slipped you*

*some money. Ah, indeed, I see—that's what he'd be pullin'.*

(T. 32) (emphasis added).

Mr. Nickola also repeatedly commented upon the issue of Plaintiff's Exhibit 26, an interrogatory response from Defendant's assistant claims manager, Randy Murdock. The interrogatory asked whether "the Defendant for the time period of 1/96 through 10/99 [had] received any complaints regarding blue flags acting as . . . trip slip and fall hazards as well as blue flags being left in the track beds, walkways, [and] ballast?" Mr. Murdock's response to this interrogatory, which was written on the letterhead of Mr. Lippert's law firm, stated, "No." Mr. Murdock's response to the interrogatory allegedly was contradicted, however, by Exhibits 9, 10, and 11. These three Exhibits represented memoranda from safety committee meetings indicating that at least some of Defendant's employees were aware of complaints regarding blue flags.

In his closing and rebuttal arguments, Mr. Nickola argued that Exhibits 9, 10, and 11 directly contradicted Mr. Murdock's interrogatory response in Exhibit 26. Plaintiff also argued at trial and continues to argue that Mr. Lippert failed to disclose the safety committee memoranda during discovery. Defendant maintains that there was no evidence that Mr. Murdock had knowledge of Exhibits 9, 10, and 11 or that such complaints regarding blue flags were ever registered with Mr. Murdock.

Focusing on the discrepancy between Mr. Murdock's interrogatory response and Exhibits 9, 10, and 11, as well as Mr. Lippert's alleged failure to disclose the safety meeting memoranda, Mr. Nickola accused Mr. Murdock, who did not testify at trial, and Mr. Lippert, of lying. Mr. Nickola began his closing argument by commenting upon the interrogatory response as follows:

*Ladies and gentlemen, that is a lie!* Claims and nothing that you hear explained it out. What the lawyers say now is not evidence. *Everyone had their chance to get up and explain the lie, but then you have to be cross examined, don't you.* Many people hear that. He said, "No." Not, not sure; not, maybe; no. What he can use, bring them to us. He brought to us, not only testimony about oral complaints—thank God it's not only that. Thank God, because if he didn't have this on the computer, ladies and gentleman, that's what it would boil down to. Labor versus management, oral agreements, no. *The cat's out of the bag now. The cat's out of the bag now. Now they gotta spin, because now they're locked into their lie.*

(T. 7–8.)

Mr. Nickola continued this attack with references such as the following: "But this represents the justice in this case, *based upon the lies, and being caught lying,*" (T. 36) (emphasis added), and "I know you've been listening and *I know you can see through the mud. Who's been straight and I just want you to keep that in mind.*" (T. 37) (emphasis added). Mr. Nickola added during his rebuttal argument:

They knew there was a hazard (sic) condition out there and they didn't do anything about our accident pyramid until someone was seriously injured. All those warnings went for nothing until somebody was seriously injured *and then what did they do? They lied about it.*

(T. 69) (emphasis added). Mr. Nickola's accusations then reached a crescendo, and he directly accused Mr. Lippert of lying to Plaintiff's counsel and the jury:

Now [Mr. Lippert] makes some statement in this court of law that they turned this information over to us, that's as true as the towers were working that

night—because it's not. We had, thank God, because look at the question, and this is an exhibit. "Has the Defendant from the time of 1996 until October, received any complaints about the blue flags?" *We asked them. We gave them a chance to be honest. We gave them a chance and they lied.* And [Mr. Lippert] sits there and says well I don't think Randy Harrison called Dr. Narten those three times that she testified. Let's not call names. Well he's calling her a liar. Do you think she's a liar? She had the courage to come into a courtroom and face cross examination by an outstanding attorney, a very seasoned attorney, and that's why he's here. She faced up to him. She had the courage, but Mr. Murdock sure didn't. Get on the stand and explain it. *Don't have your lawyer do it, because he explains a lot of things, but he doesn't back it up with any evidence, does he? And the funny thing is, ladies and gentleman, Mr. Lippert knows everything about the railroad. The history of Pierre Marquette, every object that's on it, every valve and lever in an engine— doesn't he and he should.*

*Who prepared that pleading? Who's name is on this, why at the top of the heap. Now you tell me with all that knowledge that you know about, you don't know about the blue flags either? Come on. You know everything, but look at this. We gave them a chance to be truthful, and they got caught in a lie. So when he says that we turned it all over, well put Mr. Murdock on to prove it. I tell you, you look at the dates of these things and they coincide perfectly and we would ask for any complaint. Any complaint, and the answer was no. And it's backed up by their lawyers that know everything about the railroad. They lied about it and now they want to be rewarded. Don't reward their lie.* And he says this is just (sic) manage-

ment thing, Mr. Nickola. I'm not asking for any prejudice, I'm asking for justice. (T. 69–70) (emphasis added).

█ The discrepancy between Mr. Murdock's response to the interrogatory and Exhibits 9, 10, and 11 is fairly clear, but the accusation that Mr. Murdock is a "liar" is not a reasonable inference, particularly in light of the fact that Mr. Murdock did not testify at trial and the jury had no basis on which to judge his credibility. The further allegation that Mr. Lippert had lied to Plaintiff's counsel and the jury was also unwarranted. Even if Mr. Lippert may have vouched improperly for Mr. Murdock's credibility or claimed during his opening statement that Defendant had produced all documents, (*see* Def. Opening Stmt. T. 3–4), Mr. Nickola's response was disproportionate. Clearly, not every evidentiary or discovery dispute is the result of lies by a witness or counsel. The parties' disagreement at the hearing on this motion as to whether all documents had been disclosed is evidence that discovery disputes are not always clear cut. However, disparaging attacks on counsel and witnesses without evidence of deliberate misconduct are inappropriate and prejudicial. *See Draper v. Airco, Inc.*, 580 F.2d 91, 96 (3d Cir.1978) ("The final category of improper conduct committed by counsel is the repeated vituperative and insulting references to the defendants and defendants' counsel."); *Fineman v. Armstrong World Indus., Inc.*, 774 F.Supp. 266, 271 (D.N.J. 1991) ("Perhaps most troubling to this Court is the unadorned, disparaging attack upon defense counsel throughout [plaintiffs' counsel's] closing argument."), *aff'd*, 980 F.2d 171 (3d Cir.1992); *cf.* Civility Principles of the United States District Court for the Eastern District of Michigan, Administrative Order No. 96–AO–024, Attorneys' Responsibilities to Other Counsel, ¶ 4 (Feb. 14, 1996) ("[An attorney] will

not, absent good cause, attribute bad motives or improper conduct to other counsel or bring the profession into disrepute by unfounded accusations of impropriety.").

Mr. Nickola also accused Mr. Lippert of improperly commenting upon a prior disability suit filed by Plaintiff against Defendant in 1985. Mr. Nickola responded to Mr. Lippert's reference to the 1985 suit as follows: .

> But [Mr. Lippert] wants to use the language, oh permanently and mental anguish, hey it's the lawyer that put that in there. You might as well take out your license and set it on the table, *but he wants to use that and spin this whole thing that would make a politician proud.* I'll tell you that. (T. 72.)

Mr. Nickola argued that the Court's instruction regarding judicial estoppel was being given to correct a misstatement by Mr. Lippert in his opening statement, in which Mr. Lippert commented that Plaintiff could return to work at CSX following this lawsuit. Mr. Nickola stated to the jury:

> All's (sic) he got to do is talk about the lawsuit, that he's filed in the past. That's it. And the case never went to trial, and you're going to hear that instruction from the Judge, *because just like the light—the light tower in opening statement, he said Larry could just go right back to work after a verdict and that's not true. And you'll hear that instruction—to correct him, just like the light tower.*

(T. 74.)

Mr. Lippert objected to this comment on the basis that the Court's instructions were not given to correct him. (T. 74.) Mr. Nickola responded to the objection, stating, "Larry Eagan cannot go back to work." (T. 74.) The Court did not expressly sustain the objection, but essentially agreed with Defendant, stating that "the instructions have been submitted and approved by counsel by both parties." (T. 74.)

The instruction at issue stated:

> I instruct you that as LARRY EAGAN has presented evidence of an inability to return to work for the defendant, that should LARRY EAGAN recover any damages in this case and apply for reinstatement at the CSX, if he is denied reinstatement by the CSX, he will be unable to file a lawsuit in a subsequent proceeding to return to work based upon claims of disability made by him in this lawsuit.

Jury Instruction No. 42.

By arguing that Plaintiff could not return to work at CSX, Mr. Nickola misstated the law of judicial estoppel. The doctrine of judicial estoppel does not preclude Plaintiff from returning to work at CSX, as Mr. Nickola contended. Rather, if Plaintiff were denied reinstatement by CSX, the doctrine of judicial estoppel would bar Plaintiff from re-litigating the issue of his permanent disability in a lawsuit for reinstatement. *See Morawa v. Consol. Rail Corp.*, No. 86–1585, 1987 WL 37496, at * 1–2 (May 27, 1987); *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598–99 (6th Cir.1982). Any prejudice stemming from Mr. Nickola's misstatement of the law was compounded by his accusation that Mr. Lippert had misled the jury and his assertion that the Court's instruction was meant to correct Mr. Lippert.

Mr. Nickola's reference to the light tower also carried the implication that Mr. Lippert had misled the jury when Mr. Lippert suggested in his opening statement that the rail yard was well-lighted on the night that Plaintiff was injured. During his opening statement, Mr. Lippert displayed Exhibit 12 to the jury, a picture of the rail yard illuminated by lights mounted upon high towers. (*See* Def. Opening Stmt. T. 13.) Mr. Nickola argued

**1002**

that subsequent evidence had demonstrated that the overhead lights were not actually functioning on the night in question when Plaintiff suffered his injury, suggesting that Mr. Lippert's prior comments were untruthful:

> Lie number two. The lighting. Show you a big picture. Remember seeing that big picture of that big light. Remember the opening statement? Now they will tell you in the complaint, it's not very lighted. Well I'll show you, while I pass holding up, Defendant's exhibit 12. The lights that you see, some gray high lights, that's two words. Lights are tall, like you see around a baseball stadium or a football stadium. Some parking lots have those big, high lights. The other lights are low, but those are more than adequate for where the work is being performed. Those are his words in opening statement, when he showed you those big high rises. Remember those? Too bad they didn't work. We found that out, didn't we? Why? They got them there. Whey don't you turn them on? Because the company didn't deem it necessary. That's why. It's just the laborers. You don't see any CEO's out there at two o'clock in the morning.

(T. 13–14.)

Again, not only did Mr. Nickola suggest that Mr. Lippert had lied to the jury, but also injected the prejudicial comment that Defendant provided less that adequate lighting for "laborers." Rather than point out a discrepancy between Exhibit 12 and subsequent evidence, Mr. Nickola felt compelled to disparage Mr. Lippert as a liar.

Mr. Nickola's reference to "laborers" and "CEOs" also appeared to be designed to incite prejudice against Defendant, a large corporation. Mr. Nickola made similar arguments during other parts of his closing and rebuttal:

> Oh, and look what we have here, *copy to all of the big ones.* This one in particular. Now your fingerprint's on it, Mr. Ballard. Don't come into court and lie. Don't follow the game plan of the claims representative."

(T. 10) (emphasis added).

> That's what we were going to hear is the blame game in this case, and that's exactly what we've heard here. That's exactly what we've heard here, and we've heard throughout this case. This is about saving money. We've got a downsized work force. They knew there was a hazard (sic) condition out there and they didn't do anything about our accident pyramid until someone was seriously injured. All those warnings went for nothing until somebody was seriously injured *and then what did they do? They lied about it.*

(T. 69) (emphasis added). Comments upon a party's size and wealth have been held to be prejudicial and inappropriate. *See City of Cleveland,* 624 F.2d at 757–58. However, Mr. Nickola continued to attack Defendant in this manner. The most damaging of such remarks came in Mr. Nickola's rebuttal, where he suggested, albeit in a hypothetical, the possibility that Defendant could infect its employees with multiple sclerosis:

> I've asked you for nothing but fairness in this case. And he wants to put up here, and he's been pulling this whole case—I've heard muscular dystrophy, I've heard multiple sclerosis, I've heard paralysis, what do you think that's about? Why do you think he uses those extremes, those horrible diseases, those horrible afflictions? Because he wants you to think oh, this is not so bad compared to that.
> *Well you know what, that's right. Do you think for one second I'd be asking for the same numbers if they infected—*

*CSX infected an employee with multiple sclerosis, or muscular dystrophy? Do you think I'd sit there and ask for this? I'd be asking for a hundred million dollars and not batting an eye, and that wouldn't be enough, would it? Especially if they knew that they were infecting one of their employees and didn't do a damn thing about it for years.*

(T. 73) (emphasis added).

This argument clearly was not based upon the record and is without any basis in fact. By raising even the possibility that Defendant might have infected its employees with horrible diseases could only have prejudiced the jury against Defendant. Moreover, the suggestion that Defendant could be held liable for $100 million would implant in the jurors' minds the notion that a mere two or three million dollar award for a knee injury was insignificant.

Plaintiff's contention that this comment was merely a response to comments and questions posed by Defendant is wholly without merit. Defendant's counsel did inquire of its vocational rehabilitation director whether employees with diseases such as multiple sclerosis had returned to work. Defendant's attempts to demonstrate that other individuals with serious conditions had returned to work was a legitimate line of questioning and argument. However, Mr. Nickola's suggestion, even in a hypothetical, that employees could be afflicted with such diseases through Defendant's negligence was entirely outside the scope of the defense and beyond the bounds of propriety.

Defense counsel objected to this commentary, and Mr. Nickola admitted before the jury, "We know that that's not possible." (T. 73.) Despite Mr. Nickola's admission and the Court's comment that the comparison was "rather inept," (T. 74), the damage by such an emotionally charged comment was already done.

As with Mr. Nickola's remark about serious diseases, Plaintiff argues that, to the extent that any of Mr. Nickola's comments were prejudicial, those comments were a necessary response to statements made by Mr. Lippert. Plaintiff's argument is unavailing. First, Mr. Nickola made many of the inflammatory comments noted above during his closing argument, which was *prior* to Mr. Lippert's closing argument. Thus, many of the allegedly improper comments by Mr. Lippert were actually in response to the numerous attacks made by Mr. Nickola.

For example, Mr. Lippert commented sarcastically that "Mr. Randy Murdock, the claims manager is a liar," (T. 39–40), and "Ms. Jackson can't be trusted," (T. 40), only *after* Mr. Nickola had attacked these witnesses in similar terms during his argument. At the outset of his argument, Mr. Nickola commented upon Mr. Murdock's interrogatory response by stating, "Ladies and gentlemen, that is a lie," (T. 7), and "[t]he cat's out of the bag now. Now they gotta spin, because now they're locked into their lie." (T. 8.) Mr. Nickola described Ms. Jackson during his argument as "better than a hired witness, they have to pay a lot of money for," and stated, "You heard her, they take her all over the country to testify. That's a set up. I think that's pretty clear." (T. 21.) Similarly, Mr. Lippert's ironic references to "the Russian Revolution," (T.43), and his comments that members of management were not part of an "evil empire," (T. 44), "management is full of liars and management is full of people you can't trust," (T. 49), and "I'm part of that management package that does this poor man in," (T. 50), were made *in response* to comments by Mr. Nickola. Mr. Nickola injected a "class warfare" element into his argument by asserting that Defendant failed to turn on the lights in the rail yard because "[i]t's just the laborers.... You don't see any

CEO's out there at two o'clock in the morning." (T. 13–14.) Mr. Nickola's attacks on management were also evident in such comments as, "Oh, and look what we have here, copy to all of the big ones. This one in particular. Now your fingerprint's on it, Mr. Ballard. Don't come into court and lie. Don't follow the game plan of the claims representative." (T. 10.) Moreover, none of the comments cited by Plaintiff in Mr. Lippert's opening statement invited the intense personal attacks launched by Mr. Nickola in his closing and rebuttal.

Plaintiff also asserts that Mr. Lippert attacked Plaintiff's witnesses in an improper manner and that such improper attacks justified any inflammatory remarks made by Mr. Nickola. In culling excerpts of Mr. Lippert's comments from the record, however, Plaintiff fails to recognize that such comments were made in direct reference to evidence adduced at trial. For example, Mr. Lippert questioned the credibility of Plaintiff's physical therapist, Randy Harrison, stating:

> He also says, this Dr. Narten [Plaintiff's physician] again, and you've heard this—*I'm just reading his testimony—he never spoke with Randy Harrison with regard to the services that (sic) provided Mr. Eagan in regard to physical therapy.* He only read his report—his report—Ms. Harrison. Is that important? Well, I don't think Dr. Narten is a liar, you know, but I do think Dr. Narten never had a conversation with Ms. Harrison—with Randy Harrison. I don't think it ever happened.

(T. 49) (emphasis added). Rather than calling Randy Harrison a "liar," these comments appear to be a reasonable inference drawn directly from Dr. Narten's testimony.

Later in his argument, Mr. Lippert states:

Ms. Harrison told you about that and I'm not going to spend a lot of time on that. I would say, that about Ms. Harrison, she was mistaken about a lot of things and she was a new hire and that's—we all are the new hire some time in our life, you know. She thought he had fracture (sic) of the femur, but he had a fracture of the tibia. And then Plaintiff's counsel says, well he never showed you a paper that shows that—well, I then showed her the paper as she wrote down here "have scope showing fracture to the femur and the tibia." Not my words, those are her words. Is that important? Well, it's only important if you want to put more emphasis on her conclusions than you should.

(T. 53.) Again, Mr. Lippert's comments reflect the evidence from the trial, during which Ms. Harrison's testimony was impeached. Rather than calling Ms. Harrison a "liar," Mr. Lippert properly invited the jury to consider her credibility in light of the fact that her testimony had been impeached.

Plaintiff also claims that Mr. Lippert injected his personal opinion into his argument when he questioned Plaintiff's credibility. Mr. Lippert stated:

> The flag, though, if he didn't like it there, he could pick it up. How many times did he make a complaint? *I don't think he ever made a complaint to anybody.* He never talked to Mr. Ballard about it. He never said to Mr. Ballard hey, I got a blinking light out there, Mr. Ballard that goes on and off and on and off, that famous blinking light that wasn't on—was not on apparently when he was working at switch 17, but was on when the conductor was working that night—was out there, and it was on when Mr. Ballard was there. How do you explain that, I don't know how you

explain that. Mr. Eagan benefits somewhat from having it off.

(T. 57) (emphasis added). The Court would agree that, in these comments, Mr. Lippert injected his personal opinion as to Plaintiff's credibility and appeared to stop just short of accusing Plaintiff of outright untruthfulness. Yet, the fact remains that these comments differ in tone and substance from the accusations launched by Mr. Nickola during his arguments. Moreover, a single questionable comment by Mr. Lippert as to Plaintiff's truthfulness in no way justified Mr. Nickola's prior and subsequent attacks on Defendant's witnesses and counsel.

Plaintiff also asserts that Mr. Lippert improperly commented upon the ultimate issue in the case by noting: "Is it an unreasonably safe place to work? I don't think so." (T. 57.) These comment were followed, however, with the statement, "Is it an unreasonably safe place to work? That's for you to decide. If you decide that it is a reasonably safe place to work, given all of the circumstances of the situation, then you have to return a verdict and you will return a verdict for the railroad." (T. 57–58.) While Mr. Lippert arguably should not have injected his personal opinion as to the ultimate issue, he properly noted that the matter was for the jury to decide.

The Court agrees that the above examples illustrate that, at certain points, Mr. Lippert injected his personal opinions into his argument. What is lacking from Mr. Lippert's argument, however, is the sort of direct attack on witnesses and counsel evident throughout Mr. Nickola's arguments. The Court concludes, therefore, that, contrary to Plaintiff's suggestion, Mr. Nickola's comments were not a justified response to comments made by Mr. Lippert.

Plaintiff next argues that even if Mr. Nickola's comments during his closing and rebuttal arguments were in some way im-

proper, Mr. Nickola informed the jury that the arguments of counsel were not evidence and reminded the jury to listen carefully to the Court's instructions. (*See, e.g.,* T. 3, 7.) Plaintiff also notes that the Court instructed the jury that the lawyers' arguments were not evidence, that the jury was to perform its function without bias or prejudice, and that the parties should be considered of equal standing. (*See* Jury Instruction No. 4.) The Sixth Circuit has noted, however, that cautionary instructions may not be sufficient to remove the probability of prejudice:

> "[T]he bench and bar are both aware that cautionary instructions are effective only up to a certain point. There must be a line drawn in any trial where, after repeated exposure of a jury to prejudicial information, ... cautionary instructions will have little, if any, effect in eliminating the prejudicial harm."

*City of Cleveland,* 624 F.2d at 759 (quoting *O'Rear v. Fruehauf Corp.,* 554 F.2d 1304, 1309 (5th Cir.1977)); *see also Draper,* 580 F.2d at 96–97 ("Where ... a closing address to the jury contains such numerous and serious violations of so many rules of proper argument as occurred here, we must conclude that it is more than 'reasonably probable' that the verdict was influenced by the prejudicial statements."). In light of the pervasiveness and inflammatory nature of Mr. Nickola's comments during his closing and rebuttal arguments, any curative instructions could not have removed the probability of prejudice.

Following over twenty hours of testimony, the jury returned its $2,500,000 award, $1,750,000 of which was for non-economic damages, in one hour and ten minutes. This award is not entirely unreasonable on its face, yet it is difficult to know the extent to which it was influenced by Mr. Nickola's inflammatory arguments. For example, based upon Mr. Nickola's re-

peated attacks on the legitimacy of Defendant's vocational rehabilitation program, it is entirely possible that the jury failed to properly consider mitigation in its damages calculation. Moreover, Mr. Nickola's personal attacks on Mr. Lippert may have swayed the jury in its apportionment of fault. Finally, given the number of issues and the length of the trial, the relatively brief period of deliberation is some evidence that the jury may have been influenced by the inflammatory comments of Plaintiff's counsel.

In reversing the district court's decision not to grant a new trial based upon improper conduct by counsel, the Third Circuit in *Draper* noted:

> In reaching this conclusion, we wish to emphasize that we do not expect advocacy to be devoid of passion. A life has been lost here and the family is entitled to have someone speak with eloquence and compassion for their cause. But jurors must ultimately base their judgment on the evidence presented and the rational inferences therefrom. Thus, there must be limits to pleas of pure passion and there must be restraints against blatant appeals to bias and prejudice. These bounds of conduct are defined by the Code of Professional Responsibility and the case law.

*Id.* at 95.

Similarly in this case, Plaintiff suffered an allegedly debilitating injury and is entitled to vigorous representation on his behalf. Yet, Defendant is also entitled to a fair trial in defense of this action, and Mr. Nickola's inflammatory comments during his closing and rebuttal arguments could only have served to generate unfair prejudice against Defendant in this case. Even though Defendant did not object until Plaintiff's rebuttal argument, Mr. Nickola's remarks during his closing and rebuttal arguments were so prejudicial as to "seriously affect[ ] the fairness, integrity, [and]

public reputation of judicial proceedings." *Reese*, 793 F.2d at 1429 (internal quotation marks and citation omitted). Therefore, the Court concludes that there is more than a reasonable probability that the comments of Mr. Nickola during his closing and rebuttal arguments influenced the jury's verdict and a new trial is warranted. Moreover, the new trial must deal with both liability and damages. *See Draper*, 580 F.2d at 97.

## IV. CONCLUSION

The Court has very reluctantly reached the conclusion that the verdict of the jury must be set aside. The decision of a jury is of course entitled to great deference and respect and only in the most egregious circumstances is to be disregarded. This Court's initial misgivings and apprehension regarding the unfortunate tactics employed by Plaintiff's counsel were enunciated in the Court's comments directed to Mr. Nickola at sidebar upon the oral submission of Defendant's motion for a mistrial and Plaintiff's counsel's oral response, just prior to the Court's action in taking the motion under advisement:

> Well, I must say, Mr. Nickola, with all due respect, you're a very effective advocate. You try a good case. You're a good attorney, but I am rather appalled at the argument that you made here; especially the last argument when counsel, of course, has no opportunity to respond. I thought it was vicious, quite frankly, vicious. And I just wonder whether you have ever read the civility rules and standards of this Court because they certainly would, I would think, make it very clear to you that that sort of thing goes beyond the bounds of propriety. I'm very disappointed in what I heard here, frankly. This is, you know—this is a lawsuit for damages. This is not a heinous murder trial or something of that kind. I never hear

that sort of thing in a criminal trial, for God sakes. But—where you've got people that could be described as every sort of a scoundrel and vicious, vicious person—the language that was used here relating to the railroad's employees goes beyond what I've ever heard in a criminal trial. I'm going to take the motion under advisement, but I want to tell you, I'm disappointed. Quite frankly, I'm very disappointed in hearing that sort of an argument in this case." (T. 78–79.)

Regrettably, a thorough and painstaking review of the transcript of the arguments in this case, and of applicable authority on the issue, leads the Court to the conclusion that the Court's initial disappointment, misgivings, and apprehension were justified, and that it would indeed under these circumstances constitute an injustice to allow this verdict to stand.

Accordingly, this Court being fully advised in the premises,

**IT IS HEREBY ORDERED** that Defendant's motion for mistrial, raised in open Court on October 29, 2002, is **GRANTED**, the jury's verdict is set aside, and this matter shall be set for a new trial to commence within ninety (90) days of the entry of this order.

**SO ORDERED.**